UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Kathy M. Avery,

       Plaintiff,                           Case No. 2:11-cv-13111

v.                                         Sean F. Cox
                                         United States District Judge

Summit Health, Inc.,

       Defendant.
_____/

## OPINION AND ORDER
## GRANTING DEFENDANT SUMMIT HEALTH'S MOTION FOR PARTIAL
## SUMMARY JUDGMENT

Plaintiff Kathy Avery ("Avery") filed a multi-count Complaint against her former employer, Defendant Summit Health, Inc. ("Summit Health"), on July 19, 2011, alleging: (1) age discrimination in violation of the Elliott-Larson Civil Rights Act ("ELCRA"); (2) sex discrimination in violation of the ELCRA; (3) aiding and abetting age and sex discrimination in violation of the ELCRA; (4) attempted discrimination in violation of the ELCRA; (5) age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"); (6) sex discrimination in violation of Title VII of the Civil Rights Act; and (7) wrongful termination/retaliation in violation of Michigan public policy.

The matter is currently before the Court on Summit Health's Motion for Partial Summary Judgment. The parties fully briefed the issues and the Court heard oral argument on March 7, 2013.

For the reasons that follow, the Court shall **GRANT** Summit Health's Motion for Partial Summary Judgment [Docket Entry No. 32].

## BACKGROUND

Summit Health "provides on-site wellness programs, including health screenings, immunizations, coaching and education seminars" for large employers. (Docket Entry No. 32, at 8.) Summit Health services its clients through its program managers, who are categorized as account managers, national account managers, and national account executives. (Avery Dep. 27–28, Jan. 23, 2012; Penington Dep. 55–56, Dec. 6, 2011.) The national account executives are the highest paid program managers at Summit Health followed by the national account managers, but they generally have no supervisory authority over the other program managers. (Avery Dep. 29; Finch Dep. 59:1–12, Jan. 16, 2012; Penington Dep. 33–34.)

Summit Health is a closely-held corporation. (Penington Dep. 6:20–21.) It is co-owned by Douglas Finch ("Finch"), COO and Secretary, and Richard Penington ("Penington"), CEO and President. (*Id.* at 6–7:7.) Penington owns 90% of the company's shares while Finch owns the remaining 10%. (*Id.* at 6:17–19.) Penington and Finch share the hiring, firing and promotion decisions at Summit Health. (*Id.* at 14–16.)

Avery started working at Summit Health as an account manager on May 14, 2007. (Avery Dep. 21:7–14, 23:1–2.) She was fifty years old at that time. (*Id.*) Her starting salary was $33,000. (*Id.* at 23:5–6.) Finch was Avery's supervisor throughout her employment at Summit Health. (*Id.* 23:10–12.)

On December 8, 2007, Avery received her first raise, increasing her salary to $38,000 a year. (*Id.* at 25:1–4.) She was later promoted to the position of national account manager sometime on

2

or around April 2008.  (*Id.* at 27:1–7.)  She also received a second raise sometime after her promotion, increasing her salary to $40,000 a year.  (*Id.* at 27:14–19.)  By the time Avery's employment at Summit Health ended in July 2010, she would receive an additional raise, increasing her final salary to $45,000 a year, which represents a 36% increase from her starting salary.  (*Id.* at 78:21–25, 118:10–13.)  Throughout her employment with Summit Health, Avery was never demoted, she never received a salary decrease, and her job responsibilities and workload actually increased with her promotion.  (*Id.* at 106.)  In addition, Avery's performance evaluations were generally positive or satisfactory with some comments for growth and development.  (Docket Entry No. 32-5; Docket Entry No. 32-8.)

While she was employed at Summit Health, Avery had difficulty getting along with her peers, including Stephanie Papadelis ("Papadelis") in particular.  (*Id.* at 48, 98–99.)  Avery contends that, as Summit Health expanded, the "attitudes toward older workers hardened."  (Docket No. 46, at 8; Avery Dep. 114.)  She claims that certain female program managers, who played up a certain stereotypical image of women and flirted with Penington, were rewarded with better clients and more support staff.  (*Id.* at 10; Avery Dep. 119, 165–66.)  She asserts that Penington would often go out for drinks with, and send flowers and forward flirty messages to, younger employees.  (Docket No. 46, at 10; Avery Dep. 214–18.)  Avery contends that because she was not young and did not flirt with Penington, she received harder, less profitable accounts and was not receiving the type of raises that she believed that she deserved.  (Avery Dep. 114–16, 218–219.)

Avery contends that her work environment and/or overall mood was generally "content" in the beginning of May 2010, but that soon soured when it was announced that her assistant, Meaghan McCullough ("McCullough"), would be transferred to work for Papadelis full-time.  (*Id.* at 121–22.)

3

Avery shared McCullough's services with Angela Kirkendall, another Summit Health employee. (*Id.* at 66–67.)  Michelle Reppen ("Reppen"), Director of Human Resources with Summit Health, sent out an email announcing the transfer, but Finch sent out a response postponing the transfer until a suitable replacement for Avery and Kirkendall was found.  (Avery Dep. 68–71.)  Avery contends that she often trained assistants who were later reassigned to work for other program managers.  (*Id.* at 70, 103.)

Avery alleges that she and Papadelis had an argument over McCullough's services, where Papadelis allegedly slammed some papers on her desk.  (*Id.* at 71:2–11.)

Sometime around May 26, 2010, Avery alleges that Penington was furious at her and slammed his hand on the table, claiming that she leaked confidential information.  (*Id.* at 81–82, 125.)  Avery alleges that, at that meeting, Penington threatened Georgia Allen and Melissa Zantop.  (*Id.* at 125.)  Both Allen and Zantop were not present at that meeting.

Sometime around June 11, 2010, Avery contends Penington yelled at her about some postings on LinkedIn.  (*Id.* at 81–82.)

Sometime around May 26, 2010, Avery wrote her letter of resignation, and informed Reppen about her decision to resign.  (*Id.* at 71–73, 125.)  Avery contends that she imposed a deadline of June 8, 2010, for Summit Health to find her a new assistant or she would quit.  (*Id.* at 72.)

On June 8, 2010, Avery submitted her letter of resignation and continued to work for Summit Health until July 2, 2010.  (*Id.* at 82–83.)

Avery's Letter of Resignation states in relevant part:

It is with reluctance that I'm submitting this letter.  Although my time with Summit Health has been, on the whole, satisfying and productive, for quite a while now I have become less and less satisfied with the work situation.  The direction of the

4

company, the group in which I work, and the lack of resources and support have made it increasingly difficult for me to effectively manage my accounts.

Therefore, it is with regret that I ask you to accept this as my resignation from Summit Health effective July 2, 2010.

(Docket No. 32-15, at 2.)

On June 10, 2010, Penington sent out a company-wide email, which provided a message of support and regret regarding Avery's decision to resign. (Docket No. 32-16, at 2.)

Avery contends that she was not scared or threatened by Penington after their exchange involving the alleged leak of confidential information, and that she hardly had any interaction with him. (Avery's Dep. 83, 125.) Up until the last day of Avery's employment at Summit Health, McCullough was officially assigned to work part-time for Avery, as per Finch's request in his email, but Avery contends that McCullough was, in reality, working mostly for Papadelis and only provided Avery with a few hours of support "here and there." (*Id.* at 73:1–5, 102.)

Avery continued working for Summit Health until July 2, 2010. (Docket No. 32, at 14; Avery Dep. 94–95.) On that day, after a party was held in her honor at Summit Health, Avery sent an email to Papadelis and other members of management and human resources at Summit Health, including Finch, Reppen, and Penington. (Docket No. 32-21, at 2.) The email states in relevant part:

Stephanie,

It has been unfortunate for many of us at Summit Health that you have been promoted to a position of power within the company. In my opinion, you are neither qualified nor capable of handling your responsibilities as an Account Executive. If you were, you'd not have interrupted me (as many as 14 times in a day) to ask me how to do your job, and you'd be able to train your own assistants.

As the self-proclaimed "Queen" of Summit Health, you have used your special relationship with Richard [Penington] to intimidate and bully those around you. Not only have you boasted about your ability to have people fired if you didn't like them,

you've actually followed through.  Several good employees have lost their jobs – and others have resigned – because of your spoiled behavior and temper tantrums. People do not like you, respect you or trust you, Stephanie – they do your bidding because they fear they will lose their jobs if they offend you.  I am greatly relieved that I will no longer have to put up with your rude, inconsiderate, and unprofessional behavior on a daily basis!

To those of you who have been copied on this email,

Shame on you for allowing and encouraging this type of behavior in the workplace! As the decision-makers at Summit, it is your obligation to do what is best for ALL of your employees – not cater to the whims of a select few.  It's time to stop letting the inmates run the asylum before you lose more good employees, field staff, and clients.

Sincerely,
Kate

(*Id.*)  Avery alleges that she did not confront Papadelis earlier with her concerns because she was afraid that she would be fired. (Avery Dep. 100.)  In describing the purpose of the email, Avery stated as follows:

This needs to be addressed because everybody there is afraid of [Papadelis]. . . .  And you shouldn't be afraid of the co-workers.  You shouldn't be intimated by them because they're the favorite of the owner.  That's the purpose of the letter.  I wanted to talk to her in person, but that whole last week I was there, I don't think she was in.

(*Id.* at 100:12–22.)

At a hearing before the Michigan Administrative Hearing System, Division of Unemployment Appeals, on December 2, 2010, Reppen testified that there was a concerted effort on the part of Penington and Finch to force Avery to resign because, "She's old.  She doesn't fit the mold."  (Avery Dep. 170–73, Docket No. 46, at 10–11; Reppen Dep. 156:7, 164–171, 178, 183, April 17, 2012.)  Reppen stated that Penington and Finch referred to Avery as "old grey mare" and "grandma," and that other employees would often joke about Avery's age behind her back. (Reppen

6

Dep. 178, 187, 209.)  Neither party disputes that these alleged comments were made outside of

Avery's presence.  (Docket Entry No. 46, at 13–14.)  Avery only learned about them at her

unemployment hearing, which was after her employment at Summit Health had ended.  (*Id.*; Avery

Dep. 171–72.)

Reppen stated that Avery was denied support for her assignments and her workload was

intensified by management in order to "work her out" of Summit Health.  (*Id.* at 158, 174–75,

185:9–12, 207, 254–55.)  When asked to further elaborate what the "mold" was at Summit Health,

Reppen testified as follows:

> Q: Now, you've also testified specifically that from the first day on the job for you
> that it would be part of your job to get Kate out of the organization.  She didn't fit the
> mold any longer.  She wasn't young and bubbly.  Is that an accurate summary of your
> testimony to the best of your recollection?
> A: She didn't fit the mold, yes.
> Q: Any longer.  Is that what they said to you?
> A: She didn't fit the mold.  I don't know if it was something different before I got
> there, but from the time that I got there, there was a mold, and she did not fit it.
> Q: Suggesting that something had changed from the time she was hired to that time
> when you were having these conversations?
> A: I do not know.  I don't know.  I can't comment on what the company was like
> before I got there.
> Q: Are you aware that Kate Avery was 50 when she was hired?
> A: I am not aware.  I don't know how old Kate is now . . . .

(Reppen Dep. 169:21–171.)  Reppen was employed by Summit Health from December 2009 to

August 2010.  (*Id.* at 42–43, 46.)

Jennifer So and Deborah Martinez ("Martinez"), former employees of Summit Health who

worked with Avery, submitted affidavits that reiterate the alleged atmosphere of discrimination

toward older female workers at Summit Health and opine that Avery's workload was atypical.

(Docket Nos. 47-6, 47-7.)

7

Martinez contends that she "became convinced that Mr. Penington held . . . negative views of older workers." (Docket Entry No. 47-6, at 3.)  She also stated that "Kate Avery was treated less favorably, denied the benefits, advancement, IT and staff support, given to younger employees." (*Id.* at 4.)  She also stated that, "[b]ased on my direct observation of the way resources such as IT support and support staff were marshaled, it seemed clear to me that Summit Health was attempting to drive Ms. Avery out of the workplace by making it so unpleasant and impossible to succeed that she would leave." (*Id.* at 5.)

So stated that she worked at Summit Health as a program manager while Avery was employed there.  (Docket Entry no. 47-7, at 2.)  She contends that she witnessed Papadelis, Melissa Dziak and other younger program managers "openly discuss Kate Avery as too old, and slowing other down."  (*Id.*)  She testified that "[a]ny suggestion that Kate Avery was given the same treatment as her younger peers when it came to assignment of work and assignment of support is incorrect.  (*Id.* at 3.)  She also observed that "Penington favored women in the office who fit his personal stereotypes of women: girly, flirty, fun, and most of all engaging and bantering with him in response to awkward flirtatious overtures."  (*Id.*)

### STANDARD OF REVIEW

Summary judgment is proper where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  The Court views the record in the light most favorable to the nonmoving party and all reasonable inferences will be drawn in favor of that party.  *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004).  "When the non-moving party fails to make a sufficient showing of an essential element of his [or her] case on which he [or she] bears the burden of proof, the moving parties are entitled to judgment as a

8

matter of law and summary judgment is proper." *Chapman v. UAW Local 1005*, 670 F.3d 677, 680

(6th Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2458, 91 L.Ed. 2d 265

(1986)). "The judge does not weigh the evidence and determine the truth of the matter but

determines whether there is a genuine issue for trial." *Blackmore*, 390 F.3d at 895 (internal

quotations omitted).

## ANALYSIS

**A.**    **Avery's Age and Gender Discrimination Claims Under Title VII, the ELCRA, and the ADEA.**

At the summary judgment stage, a plaintiff must adduce either direct or circumstantial

evidence to prevail on her discrimination claim. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir.

2004). Here, Avery relies on circumstantial evidence.

Under the circumstantial evidence approach, a plaintiff must show the existence of facts

which create an inference of discrimination under the familiar *McDonnell Douglas* burden-shifting

framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The *McDonnell

Douglas* framework is applied to Avery's Title VII, ELCRA, and ADEA claims. Avery bears the

burden of establishing a prima facie case.

In order to establish a prima facie case of age and gender discrimination, a plaintiff must

establish that: 1) she is a member of the protected class; 2) she suffered an adverse employment

action; 3) she was qualified for the position she held, and 4) she was replaced by a person outside

of the protected class or that similarly situated non-protected employees were treated more favorably.

*See Diebel v. L & H Res., LLC*, 492 Fed. App'x 523, 527, 2012 WL 2817948, at *3 (6th Cir. July

10, 2012); *Humenny v. Genex* Corp., 390 F.3d 901, 906 (2004); *Hall v. State Farm Ins. Co.*, 18 F.

9

Supp. 2d 751, 766 (E.D. Mich. 1998); *Ensley-Gaines v. Runyon*, 100 F.3d 1220, 1224 (6th Cir. 1996); *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1311–12 (6th Cir. 1989).

Avery asserts age and gender discrimination under Title VII, the ADEA, and the ELCRA based upon five distinct adverse actions: (1) constructive discharge, (2) denial of promotion, (3) denial of pay, (4) denial of training, and (5) denial of information technology ("IT") support and administrative support.

In its Motion for Partial Summary Judgment, Summit Health only challenges whether or not Avery was subjected to a constructive discharge. Furthermore, with regard to Avery's gender-based discrimination claims under Title VII and the ELCRA, Summit Health asserts that Avery cannot establish that she was subjected to gender discrimination.

### 1.    Avery Was Not Constructively Discharged.

To make out a prima facie case of age and gender discrimination under Title VII, the ELCRA and the Age Discrimination and Employment Act, a plaintiff must show that she was subject to an adverse employment action. For the purposes of establishing a prima facie case of age and gender discrimination, a plaintiff who resigns may nevertheless establish an adverse employment action by demonstrating that he or she was constructively discharged. *See Goldfaden v. Wyeth Labs., Inc.*, 482 Fed. App'x 44, 47–48, 2012 WL 1676664, at * 2–3 (6th Cir. May 14, 2012); *Agnew v. BASF Corp.*, 286 F.3d 307, 309 (6th Cir. 2002). "To demonstrate constructive discharge, a plaintiff must adduce evidence to show that (1) 'the employer . . . deliberately create[d] intolerable working conditions, as perceived by a reasonable person,' (2) the employer did so 'with the intention of forcing the employee to quit,' and (3) 'the employee . . . actually quit.'" *Goldfaden*, 482 Fed. App'x at 48, 2012 WL 1676664, at *2 (quoting *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th

Cir. 1999)). "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Moore*, 171 F.3d at 1080. Furthermore, the Sixth Circuit held that the following factors are also relevant:

> Whether a reasonable person would have [felt] compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a [male] supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Regan v. Faurecia Auto. Sealing, Inc.*, 679 F.3d 475, 482 (6th Cir. 2012) (quoting *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 451 (6th Cir. 2005)). "The test deliberately 'sets a high bar,' as the law generally expects employees to remain on the job while pursuing relief from harassment." *McKelvey v. Sec. of the U.S. Army*, 450 Fed. App'x 532, 535, 2011 WL 6183516, at * 3 (6th Cir. 2011) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 147, 124 S. Ct. 2342, 159 L.Ed.2d 204 (2004)). "Plaintiffs alleging constructive discharge must establish that 'the working environment *at the time of their resignation*' forced them to quit. The question is whether, given the totality of the circumstances, the employee left 'within a reasonable time after last being the subject of discrimination." *Id.* (quoting *Baugham*, 211 Fed. App'x 432, 440 (6th Cir. 2006) (emphasis added)). This is because the premise of a constructive discharge claim " is that conditions were so bad that the plaintiff was essentially fired—and people who are fired do not remain on the job for an extended period of time." *Id.* at 536, 2011 WL 6183516, at * 3.

Viewing the evidence submitted here in a light most favorable to Plaintiff, prior to her resignation, Plaintiff had experienced the following while employed by Defendant:

11

- Reppen testified that Avery was mocked behind her back by Penington and Finch, as well as some of her other peers, with names such as 'grandma' and 'old gray mare,' and that there was a concerted effort to 'work [Avery] out' of Summit Health because she was too old. (Reppen Dep. 170–71, 183–85, 206–09; Docket Entry No. 46-4.)

- Avery alleges that one of her peer(s) grabbed some of her work files and slammed them on her desk and/or floor, and that her co-worker Melissa Dziak told her "I hate you for making my life more difficult." (Avery Dep. 71, 168; Reppen Dep. 206–07.)

- Some of the promotions that Avery believed she deserved went to her younger peers, whom she previously had trained. (Avery Dep. 168, 205.)

- Papadelis bragged that she could get anyone fired at Summit Health. (Avery Dep. 99–100.)

- Avery was assigned high maintenance, low revenue clients that no other program manager wanted. (Reppen Dep. 175, 120–21, 173–75, 254–55, 380–81; Finch Dep. 118–21, 124, 151–52; Avery Dep. 116, 163–64, 200; Docket Entry Nos. 47-6.)

- In her employee evaluations, Avery was allegedly wrongly criticized by Finch about the profitability of her accounts, directed to track her profitability, and subjected to peer review. (Docket Entry Nos. 47-5, 47-10; Reppen Dep. 380–81; Avery Dep. 42, 47; Finch Dep. 114–16.)

- Avery alleges that Finch instructed her to forge patient consent forms and Penington instructed her to hold health screenings in Maryland without securing permits. (Avery Dep. 84–89, 187–88.)

- Avery contends that she personally observed other program manager(s) forging patient consent forms, and was encouraged to work more like her peers. (Avery Dep. 84, 87–88, 187–88, 191, 290–91; Reppen Dep. 217, 230–31, 245–47, 346–48.)

- Penington yelled at Avery twice and slammed the table in her presence after accusing her of leaking confidential information. (Avery Dep. 124–25, 174–78, 182, 282; Docket Entry No. 46-7.)

- Penington allegedly threatened several former employees in her presence, but outside the presence of the employees that he allegedly threatened. (Avery Dep. 177–78, 282.)

- Summit Health allegedly used Avery's credentials to secure the 'Kroger' account and Penington and Finch allegedly made certain misrepresentations and/or embellishments in their 'pitches' to new clients. (Docket Entry No. 47-11; Reppen Dep. 72; Avery Dep. 192–98.)

12

- Avery was denied a full-time assistant, and allegedly wrongly criticized in her employee evaluation for failing to use assistants. (Penington Dep. 63–67, 180, 186; Avery Dep. 26, 55, 70–71,185, 284–85; Docket Entry No. 47-7; Reppen Dep. 65, 78, 158.)

- Avery was provided with a dysfunctional computer. (Avery Dep. 44–45.)

- Warehouse staff allegedly refused to work with Avery under the direction of Penington and Finch. (Avery Dep. 113–14, 225–28, 274–75.)

- Penington and Finch made no effort to redress Avery's concerns about her allegedly intolerable work environment. (Avery Dep. 70–72, 89, 108–12, 116; Reppen Dep. 162–64.)

Finch remained Avery's supervisor throughout her employment at Summit Health. (Avery Dep. 23:5–6.) Furthermore, Avery was never offered an early retirement option. She was never demoted and her salary was never decreased. In fact, Avery was promoted to national account manager and she received, at least, three (3) pay raises, increasing her salary by 36%. (*Id.* at 78:21–25, 118:10–13.) In addition, Avery's job responsibilities actually increased when she was promoted to national account manager. *See Woodmore v. Farmington Hills Police Dep't*, No. 09-12967, 2011 WL 2144522, *4–5 (E.D. Mich. May 31, 2011) (holding that dissatisfaction with work assignments is normally not sufficient to establish constructive discharge).

With regard to Avery's employee evaluations, except for a few comments where Finch provides suggestions for improvement, for the most part, those evaluations provide her with good or satisfactory ratings. *See Fisher v. Dep't of Veterans Affairs, et. al.*, No. 08-10748, 2009 WL 1885072, *5 (E.D. Mich. June 30, 2009) (holding that good evaluation ratings by an employer are suggestive that the employee has not been subjected to a constructive discharge). Additionally, the Court notes that in the February 25, 2010, performance appraisal, Finch's ratings are very close to Avery's self-ratings. (Docket Entry 32-8.)

Furthermore, the fact that Avery may or may not have been "wrongly criticized" for her

13

accounts' profitability in her performance evaluations and that she was required to track her accounts' profitability seems to be isolated incidents related to her evaluations.  Likewise, Avery's contention that she was subject to peer review in her performance evaluation also is of little relevance to this inquiry. None of the evaluations in this action were made around the time of her resignation.  (Docket Entry Nos. 32-4, 32-5, 32-8, 47-5.)  The peer comment that Avery presumably refers to in her response states as follows:

Manager:

- Internally, has inconsistent relationships with others in company:

  ○ Peer PMs are puzzled by behavior which can appear at times to be obsessive and inflexible, and at other times to be gracious and helpful.

  ○ When frustrated or under pressure, Kate can be heavy handed and condescending to people in other departments; yet, when she has the time she can be very generous and helpful to others who need help.

(Docket No. 47-5, at 6.)  This comment seems to be more based on Finch's observations of Avery's behavior around the office as opposed to "peer review."  Regardless, the Sixth Circuit held that "a negative performance evaluation does not constitute an adverse employment action, unless the evaluation has an adverse impact on an employee's wages or salary." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir. 2007).  Here, Avery's performance reviews were generally positive and, in some cases, in line with her self-ratings.  These evaluations likely had no effect on Avery professionally given her history of promotion and pay raises in this action.

Next, the Court finds that witnessing Penington threaten other employees outside of their presence does not constitute badgering, harassment, or humiliation.  Regardless, the threats were not

14

directed at Avery.

Likewise, simply being yelled at on two separate occasions by Penington over a two week period does not amount to badgering or harassment. Avery admitted that she had no further exchanges with Penington. (Avery Dep. 127.) The same is true for the instances involving Avery's co-worker(s) who allegedly threw some of her work files on her desk and floor and a coworker who said to Avery at one time, "I hate you for making my life more difficult." (Avery Dep. 71, 168.) These occurrences, as well as Papadelis' alleged comment that she could get anyone fired, pertain more to internal squabbles among her peers/program managers. (*Id*. at 99–100.) Avery does not allege that they had any supervisory authority.

Summit Health points out that Avery did not submit her letter of resignation for two weeks after drafting it, and then she waited an additional four weeks before actually resigning from her position. (Docket Entry No. 32, at 23.) The Court recognizes that waiting too long to leave is not conclusive in this analysis, but it is, at least, suggestive that conditions were not so bad at Summit Health so as to force a reasonable employee in Avery's shoes to resign. *McKelvey*, 450 Fed. App'x at 536, 2011 WL 6183516, at *4.

With regard to Avery's assertions about the alleged unethical misconduct on the part of Summit Health's employees, who allegedly forged patient consent forms, the directive to hold health screenings without obtaining a permit, and Summit Health's practice of using her credentials to secure accounts, those events seem isolated from Avery's decision to resign. (Avery Dep. 84-89, 187-88.) As will be further discussed in Section D, Avery could only provide a few examples of instances where Finch allegedly told her to sign a patient consent forms in April or May 2010 and Penington allegedly told her to proceed with a health screenings without a permit. (Avery Dep.

15

84–89, 186–88.)  Avery never specifically cited to those issues in her letter of resignation or in her email to Papadelis.  (Docket Entry No. 32-15, 32-21.)

With regard to the alleged comments about Avery's age made by Penington and the other members of management, they were made outside of Avery's presence.  (Avery Dep. 171–72.)  She only learned about those alleged comments at her unemployment hearing after her employment at Summit Health ended.  *See Fisher*, 2009 WL 1885072, at *4 (addressing a similar issue in the context of a hostile work environment claim).

Regardless, all of the alleged verbal abuse and harassment that Avery alleges that she suffered in this action, as well as Avery's assertion that certain employees, who worked in Summit Health's warehouse, allegedly refused to work with her does not suggest that a reasonable person in Avery's position would have felt compelled to resign.  *See id.* at 535, 2011 WL 6183516, at *4 ("It is 'sever[e]' and 'humiliating,' not a collection of 'mere offensive utterance[s].'" *Id.* (quoting *Goldmeier v. Allstate Ins. Co.*, 337 F. 3d 629, 635 (6th Cir. 2003).  "It is the sort of 'repeated . . . taunting' that goes beyond what one finds in even an ordinary hostile work environment."); *see also Patty Cleveland v. Southern Disposal*, 491 Fed. App'x 698, 708, 2012 WL 3241561, at *10 (6th Cir. Aug 9, 2012) ("To be sure, there is evidence that Plaintiff was not pleased with management or some of her co-workers. But as previously explained in our discussion of Plaintiff's hostile work environment claim, Plaintiff's evidence of harassment and disparaging comments were isolated to only a few incidents and by a few individuals and were not pervasive enough to significantly alter her working conditions."); *Spraggins v. Lakepoine Senior Care and Rehab Center*, No. 08-14074, 2010 WL 3927769, at 14–15 (E.D. Oct. 4, 2010).

Avery's problems with her computer while she worked at Summit Health also have marginal

16

relevance to this inquiry.  *See Bialek v. American Color Graphics, Inc.*, No. 09-10208, 2011 WL 8209, at *9 (E.D. Mich. 2011).  The same is true for Summit Health alleged practice of embellishing pitches to new clients and using Avery's credentials to secure accounts.

In her letter of resignation, Avery cites to a general lack of support staff as the primary reason for her resignation.  (Docket Entry No. 32-15, at 2.)  Her email to Papadelis asserts that she was frustrated with management's alleged preference for younger, female workers who were more open to flirtation.  (Docket Entry No. 32-21.)  Avery was often tasked with training new assistants from a common pool, meaning that she often had short term assistants at her disposal.  (Avery Dep. 103, 184.)  Furthermore, Avery had McCullough's services "here and there" prior to her last day of work, and it appears Summit Health was making some efforts to secure Avery a new assistant during that time.  (Docket Entry No. 32-11; Avery Dep. 73:1–5, 102.)  Having a personal assistant likely has a marginal affect on Avery's daily workload, especially considering that she received a promotion and three (3) pay raises, allegedly without a full-time assistant.  There is no suggestion that she was working extra hours or constantly taking work home with her to meet unrealistic deadlines.  There is very little mention in Avery's deposition testimony of her having to work after hours.  Again, the evidence suggests that Avery received good or satisfactory employee evaluation ratings. Management even went as far as to trust her with training/mentoring account managers, interns, and assistants.  (Avery Dep. 103, 184, 202–12.) Both Penington and Finch stated that one of Avery's accounts, Humana, was her largest account and had substantial growth potential.  (Penington Dep. 38, 103; Finch Dep. 74, 119.)  Avery testified that she was "content" with her working environment in early May 2010 up until the time McCullough was allegedly taken away from her.  (Avery Dep. 121–22.)

17

Accordingly, the Court holds that there is insufficient evidence to establish a constructive discharge in this action.

**2.      Avery Was Not Subjected to Gender/Sex Discrimination.**

Summit Health asserts that there is no genuine issue of material fact with regard to Avery's gender discrimination claims because (1) at the time of her resignation, 95% of the program managers at Summit Health were women; (2) all the promotions that Avery believes she deserved went to women; and (3) Avery's deposition testimony asserts, for the most part, that she was discriminated against only on the basis of her age.  (Docket No. 32, at 24–26.)

"To make out a prima facie case for gender discrimination, a plaintiff must show that she was . . . treated differently than similarly situated male employees for the same or similar conduct." *Humenny*, 390 F.3d at 906 (citing *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 928 (6th Cir. 1999)).  Avery does not provide any evidence that she was treated differently than similarly situated male employees or that she worked with any male program managers. Likewise, Avery's and Reppen's deposition testimony generally assert that management allegedly discriminated against Avery on the basis of age, not her gender.

To support her claim of gender discrimination in this context, Avery advances a theory based on sexual stereotyping by an employer discussed in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).  In *Price Waterhouse*, the plaintiff was the senior manager at Price Waterhouse in the firm's Washington, D.C. office.  *Id.* at 231–32, 109 S.Ct. at 1781. In order to secure partnership status, she needed the approval of the other partners, who were predominately male.  *Id.* at 231–33, 109 S.Ct. 1780–82.  Her application was rejected by the partners for a variety of reasons that were based more on her lack of feminine traits as opposed to her dedication to her

18

job or work ethic, including being characterized as "overly aggressive" and "macho," among other things. *Id.* 234–35, at 109 S.Ct. at 1782. Furthermore, the partners' comments even went as far as to provide suggestions on how the plaintiff could be more feminine, including using less profanity, taking a charm school class, and walking and dressing more femininely. *Id.* In addressing the plaintiff's Title VII claims for sexual discrimination based on the theory of sexual stereotyping, the Supreme Court recognized that, "[i]n the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender." *Id.* at 1790–91, 109 S.Ct. at 250. Furthermore, the Court reiterated that, "[a]n employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not. Title VII lifts women out of this bind." *Id.* at 791, 109 S. Ct. 251.

The Sixth Circuit, in describing the impact *Price Waterhouse* had on Title VII claims, stated that "[i]t is true that, in the past, federal appellate courts regarded Title VII as barring discrimination based only on 'sex' (referring to an individual's anatomical and biological characteristics), but not 'gender' (referring to socially-constructed norms associated with a person's sex) . . . . However [that approach] . . . has been eviscerated by *Price Waterhouse*." *Smith v. City of Salem*, 378 F.3d 566, 573 (6th Cir. 2004);. "By holding that Title VII protected a woman who failed to conform to social expectations concerning how a woman should look and behave, the Supreme Court established that Title VII's reference to 'sex' encompasses both the biological differences between men and women, and gender discrimination, that is, discrimination based on a failure to conform to stereotypical gender norms." *Smith*, 378 F.3d at 573. "Sex stereotyping based on a person's gender non-conforming behavior is impermissible discrimination, irrespective of the cause of that behavior . .

19

. .” *Id.* at 575; *see also Barnes v. City of Cincinnati*, 401 F.3d 729, 735–37 (2004).

Here, there is no evidence suggesting that Avery was subject to any kind of comments that the plaintiff in *Price Waterhouse* was subjected to.  Instead, all of the alleged discriminatory comments occurred outside of Avery's presence and involved her age, not her gender.  Likewise, there is no evidence suggesting that Penington and Finch discriminated against Avery on the basis of her gender.  Avery's and Reppen's deposition testimony focuses almost exclusively on age discrimination.  Reppen reiterates, on several occasions, that Avery did not fit the "mold" at Summit Health because of her age, not her gender.  (Reppen Dep. 165–67, 169–70, 178–89, 203–05, 207–08.)  Avery, likewise, focused primarily, if not exclusively, on describing the alleged age based discrimination that she was subjected to while employed at Summit Health in her deposition testimony.  (Avery Dep. 114, 119, 128–30, 204–25, 281.)  In particular, Avery stated:

> From what I observed and the way I was treated, I feel that because, I wasn't – even though I was a female, because I wasn't a younger, attractive, available, flirtatious female, that I was treated differently, and Deb Martinez felt the same way. We had been there a long time we were very competent, very capable, yet we weren't given advantages.  We weren't given the job opportunities, the accounts that the younger ones were.  The only difference is that they were younger and flirted.

(Avery Dep. 218–219:12.)  Flirtatiousness, bounciness, and attractiveness are not distinctly feminine traits.  Avery is essentially re-characterizing her age based discrimination claims as gender based discrimination claims.   All of Avery's discrimination claims are age based discrimination claims no matter how they are presented to the Court.

## B.      Avery's Aiding and Abetting Claims under the ELCRA.

Summit Health contends that under the ELCRA a corporation cannot aid, abet, incite, compel, or coerce its agents to engage in a violation because a corporation and its agents are not

20

separate entities for the purposes of the ELCRA.  (Docket No. 32, at 26.)

Section 37.2701 of the ELCRA provides that:

Two or more persons shall not conspire to, or a person shall not: . . .

(b) Aid, abet, incite, compel, or coerce a person to engage in a violation of this act.

M.C.L. § 32.701(b).  The ELCRA defines a person as a "corporation."  M.C.L. § 37.2103(g).

Neither party presented any case law establishing whether a corporation can or cannot be liable for aiding and abetting its agents' violation of the ELCRA.  A somewhat similar issue has been addressed in the context of civil conspiracy claims where courts have held that an employee and his or her corporate employer may not be counted separately for purposes of finding a proscribed combination.  *See Upton v. City of Royal Oak*, 492 Fed. App'x 492, 503–04, 2012 WL 1662024, at *10–11 (6th Cir. May 11, 2012) ("This court has adopted the general rule in civil conspiracy cases that a corporation cannot conspire with its own agents or employees.  *Doherty v. American Motors Corp.*, 728 F.2d 334, 339 (6th Cir. 1984).  Although the doctrine was first developed in the context of antitrust litigation, this court in *Doherty* stated, '[T]he same rule has been consistently applied in allegations of conspiracy under the Civil Rights Act.' *Id.*"); *The Metro Club v. Schostak Brothers & Co.*, 89 Mich. App. 417, 420; 280 N.W.2d 553, 554 (Mich. App. 1979).  The Court finds these cases persuasive as to the issue before the Court.  Avery does not offer any case law asserting how a corporation can be directly liable by acting through its employees and be liable for aiding and abetting that employee's actions under the ELCRA.  Corporations act through their agents and employees.  *Stough v. Jett Management Services, LLC*, __ N.W. 2d__, 2008 WL 786758, at *7 (Mich. App. March 25, 2008) ("Though not usually referred to as a tort, 'discrimination claims have

21

always been characterized as a species of statutory tort,' *Mack v. Detroit*, 467 Mich. 186, 194 n. 6, 649 N.W.2d 47 (2002), superseded on other grounds by MCL 600.2912(e), and it is well-settled that 'agents and officers of a corporation are liable for torts which they personally commit, even though in doing so they act for the corporation, and even though the corporation is also liable for the tort,' *Warren Tool Co. v. Stephenson*, 11 Mich. App. 274, 300, 161 N.W.2d 133 (1968).")"; *Edmonds v. Fehler & Feinauer Const. Co.*, 252 F.2d 639, 641 (6th Cir. 1958) ("A corporation acts through its agents.").

**C.     Avery's Attempted Discrimination Claim Under the ELCRA.**

Summit Health contends that the ELCRA does not provide a cause of action for attempted discrimination because a plaintiff must have suffered an adverse employment action to bring a discrimination claim under the ELCRA.  (Docket No. 32, at 26–27.)

Michigan Compiled Laws Section 37.2701(c) of the ELCRA provides that: "Two or more persons shall not conspire to, or a person shall not . . . [a]ttempt directly or indirectly to commit an act prohibited by this act."  M.C.L. § 37.2701(c).

Avery offer no case law describing how a corporation can attempt to discriminate against an employee under the ELCRA.  The only elements that a defendant can "attempt" under the ELCRA are that she was subject to an adverse employment action and that she was treated differently than a similarly situated employee outside of the protected class.  Neither of those elements suggest that a corporation can engage in an attempted adverse action or attempt to treat a employee differently. *See Crofcheck v. Meridian Retail*, __N.W.2d__;1997 WL 33330726, *3–4 (Mich. App. Dec. 9, 1997).

**D.      Avery's Michigan Public Policy Claim.**

At the March 7, 2013, motion hearing, the Court asked Ms. Sarah Prescott, Avery's attorney, what is the factual and legal basis for her Michigan public policy claim. Ms. Prescott stated that Avery bases this claim on her constructive discharge/wrongful termination for her refusal to forge patient consent forms and to hold health screenings without securing state permits.

"A claim for termination of employment in violation of public policy must be based on 'an objective legal source' establishing public policy." *Irwin v. Ciena Health Care Management, Inc.* __N.W.2d__, 2010 WL 4977928, at *1 (quoting *Kimmelman v. Heather Downs Mgmt Ltd*, 278 Mich.App 569, 573; 753 N.W.2d 265, 268 (2008). Such "[a] cause of action [for wrongful discharge] has been found to be implied where the alleged reason for the discharge of the employee was the failure or refusal to violate a law in the course of employment." *Suchodolski v. Mich. Consol Gas Co*, 412 Mich. 692, 695; 316 N.W.2d 710 (1982).

Here, because Avery was neither terminated nor constructively discharged by Summit Health, the Court holds that her claims under Michigan public policy are not actionable.

While Count 7 in the Complaint also mentions "retaliation," Avery did not provide any argument for this claim at the March 7, 2013, motion hearing or assert that it was a separate claim from her wrongful termination claim even though the Court gave her sufficient opportunity. Avery never provided any case law in Michigan recognizing a separate retaliation claim under Michigan public policy. Instead, that claim has been used synonymously in the context of a wrongful discharge claim under Michigan public policy. *See Vagts v. Perry Drug Stores, Inc.*, 204 Mich. App. 481, 516 N.W.2d 102 (Mich. App. April 5, 1994.)

Summit Health does not provide any argument challenging this claim in its Motion for Partial

Summary Judgment.  (*See* Docket Entry No. 32, at 8.)

However, Avery only provides one instance where Finch allegedly directed her to forge a patient consent form sometime in April or May 2010.  (Docket Entry No. 46, at 9-10, 16; Docket Entry No. 64, at 3-4; Avery Dep., 83-89, 187-91, 290-91; Docket Entry Nos. 46-4, 46-6, 46-7; Reppen Dep. 217, 230-31, 243-48, Reppen Dep. 346-48, May 11, 2012.)  Avery never followed Finch's alleged directive.  Furthermore, the health screening event that Avery alleges that Penington ordered her to hold without a permit was called off and a bone density was substituted. (Avery Dep. at 186–87.)  Although Reppen testified that Penington may have withheld an account from Avery as a result of the health screening incident, Reppen could not identify what account was allegedly withheld and did not provide any time frame for her observation.  (Reppen Dep. 348–49.)  Regardless, both events played little, if any, role in Avery being denied promotion, training, pay or IT and administrative support, considering that the alleged directive from Finch occurred in April and May 2010, and the alleged directive from Penington regarding the permit occurred sometime in the spring of 2010, and Avery submitted her letter of resignation on June 8, 2010.  (Avery Dep. 85, 87, 187.)  Likewise, most of the alleged unethical or illegal conduct seems to have involved Avery's peers/fellow program managers.  (Docket Entry Nos. 46-4, 47-6, 47-7.)  Accordingly, under Federal Rule of Civil Procedure 56(f), the Court grants summary judgment with regard to this issue on grounds not raised by Summit Health.  FED. R. CIV. P. 56(f).  Therefore, the Court holds that Avery failed to establish a genuine issue of material fact with regard to this issue.

## CONCLUSION AND ORDER

**IT IS ORDERED** that Summit Health's Motion for Partial Summary Judgment [Docket Entry No. 32] is **GRANTED** with regard to Counts 2, 3, 4, 6, and 7;

24

**IT IS FURTHER ORDERED** that, with regard to Counts 1 and 5, Avery's constructive discharge claims are **DISMISSED**.  Accordingly, the only claims that remain in this action are whether Avery was denied training, promotion, pay and administrative and IT support in Counts 1 and 5.

**IT IS SO ORDERED**.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  March 26, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 26, 2013, by electronic and/or ordinary mail.

S/Jennifer McCoy
Case Manager